IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| RACHAEL D. BARTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:17-cv-622-SEB-DML |
| v. | ) | |
| | ) | |
| AT&T, INC. and NEXLINK | ) | |
| COMMUNICATIONS, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S RESPONSE BRIEF IN OPPOSITION TO
NEXLINK COMMUNICATION'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Rachael D. Barter, by counsel, and pursuant to the Federal Rules of Civil

Procedure, respectfully submits her response brief in opposition to NexLink Communication's

motion for summary judgment.  The motion for summary judgment should be denied for the

following reasons.

**FACTUAL BACKGROUND**

A.    **Barter's Employment at AT&T**

Barter was hired by AT&T in 2008 as a business account manager.  (Barter, at 19:12-17 &

21:19-21).  She was promoted to sales manager in 2009.  (Id., at 24:4-11).  As sales manager,

Barter oversaw multiple business account managers.  (Id., at 23:12).  She was employed in

Michigan during this period.  (Id., at 22:13-17).  In 2011, Barter transferred to Indianapolis where

she served as a sale manager for the mobile division.  (Id., at 26:8-13).

In late-2013, Barter was laterally transferred to the Indianapolis landline division.  (Barter,

at 29:4-10).  She continued to serve as a sales manager.  (Id.).  At this time, John Ligon became

Barter's immediate supervisor.  (Id.).  Barter was not happy with her new assignment and did not

want to be associated with Ligon.  (Id., at 78:9-12).  Ligon was known to be extremely demanding

and engaged in dirty sales practices.  (Id., at 78:20-80:6).  He also had the reputation of being dishonest.  (Id.).  Andrea Messineo was Ligon's immediate supervisor.  (Messineo, 11:20-22).  Messineo was the Vice President of Sales.  (Id., at 10:25-11:2).

In May 2014, Barter learned that AT&T's Small Business Group was fraudulently inflating its IRU (widget) counts in order to meet its sales goals.  (Barter, at 63:20-23 & 68:10-17).  Barter reported this information to Ligon.  (Id., at 63:1-6; 74:17-21 & 76:2-5).  Instead of taking remedial measures, Ligon's response to Barter's report was to ask her: "Do you know how they're doing it?"  (Id., at 63:24-25).  Barter said yes.  (Id., at 64:3).  Ligon then told Barter that she was going to start inflating the landline team's widget count using the same method.  (Id., at 64:4-7).  Barter objected.  (Id., at 63:9-13).  Ligon said "too bad."  (Id., at 63:14-15).  At Ligon's direction, and in fear of termination if she disobeyed, Barter inflated the team's IRU counts for several months in order to meet the team's sales goals.  (Id., at 69:23-24; 70:14-18 & 82:21-25).  This did not increase Barter's compensation or commission.  (Id., at 65:18-23; 70:18-71:2 & 126:21-25).

In September 2014, Barter and Ligon attended a business trip.  (Barter Affidavit, at ¶ 5).  Ligon drank heavily.  (Id.).  After dinner, Ligon asked Barter to come into his hotel room to discuss AT&T business.  (Id.).  Barter sat in a chair.  (Id.).  Ligon sat on the bed.  (Id.).  Ligon patted the bed and told Barter to sit next to him.  (Id.).  Barter refused.  (Id.).  Ligon said: "I'm your boss come here!"  (Id.).  He then exposed his penis to her.  (Id.).  He also told Barter not to act like she did not want it.  (Id.).  Barter fled the room.  (Id.).

Barter reported the incident "hypothetically" to Michelle Caniglia in AT&T Human Resources.  (Barter Affidavit, at ¶ 6).  Caniglia told Barter that without proof, the company would likely take no action.  (Id.).  She also told Barter that the reporting employee would likely be moved to another supervisor and would probably end up being terminated because she would now be

considered a problem employee.  (Id.).  Caniglia advised Barter not to make a formal harassment report.  (Id.).

In January 2015, Barter was advised that she was being investigated for violating AT&T's code of conduct.  (Barter, at 49:9-10).  She was suspended until further notice.  (Id., at 50:9-11).  The alleged violation stemmed from the inflation of the IRU numbers that was done at Ligon's direction.  (Id., at 49:21-22).  Barter was very specifically told by AT&T not to disclose the investigation.  (Id., at 87:24-25 & 100:7-14).

During the Asset Protection interview concerning the inflation of the IRU numbers, Barter reported being sexually harassed by Ligon.  (Barter, at 91:24-92:3).  Ligon resigned from AT&T shortly after Barter's report was made.  (Id., at 98:13-18).  No formal disciplinary action was ever taken against Ligon by AT&T with respect to either the inflation of the IRU numbers or his sexual harassment of Barter.  (Messineo, 23:25-24:2).

Barter was terminated on March 15, 2016 by Messineo.  (Id., at 13:18-21).

**B.     Barter's Employment at NexLink Communication**

On April 1, 2015, Barter was hired by NexLink.  (Messano, at 17:4-7). NexLink is a distributor of new and used wireless devices and services.  (Id., at 8:12-15).  NexLink is also a "Solutions Provider" for AT&T.  (Id., at 14:6).  As an AT&T Solutions Provider, NexLink works closely with AT&T to develop business solutions for AT&T and its customers.  (Id., at 14:6-11).

AT&T/NexLink relationship is governed by a AT&T Affiliate Agreement.  As a NexLink employee, Barter was classified as a "Non-Payroll Worker" by AT&T.

NexLink's primary contacts at AT&T were Greg Smith and Marty Deschaine.  Smith and Deschaine were employed in AT&T's Alliance Channel.  (Smith, at 10:1-2 & 12:6-10).  Andrea Messineo was not.  (Id., at 17:24-25).  She was in sales.  (Messineo, at 10:25-11:2).  Messineo had

never been associated with the Alliance Channel.  (Smith, at 18:1-3).  She had never taken a role in working with NexLink or any other solutions provider.  (Messineo, at 13:8-12).

Barter was given access to the SPOT, ROME Mobility, and Fieldglass computer/database systems by AT&T in April 2015.  (Deschaine, at 15:2-22, 17:14-15 & 20:23-21:4).   However, Barter was denied access to the Phoenix system at this same time.  (Smith, at 22:20-22).  But Smith quickly developed a solution whereby Barter could access the Phoenix system indirectly.  (Id., at 46:9-47:1).

Both Smith and Deschaine testified that Barter's lack of Phoenix access would not create a problem for NexLink; it would not prevent Barter from performing her job.  (Smith, at 24:9-11) ("So it's not uncommon for sales folks not to have Phoenix access, as long as somebody in the back office has Phoenix access."); (Deschaine, at 30:3-6) (Q:  So, was NexLink able to do what it needed to do in terms of fulfilling its obligations [as a] solutions provider?  A: Yes.").  Jeff Messano, NexLink's President, also testified that this Phoenix arrangement "was fine with [NexLink]."  (Messano, 30:5-14).

Andrea Messineo knew that Barter had taken a position at NexLink in April 2015.  (Messineo, 26:10-13).  There is no evidence that AT&T made an objection to Barter's employment at NexLink in April or May 2015.   In fact, Deschaine testified that, during this time, the NexLink relationship was progressing well.  (Deschaine, at 32:30-33:8).  There were no problems with Barter, NexLink, or the solutions provider relationship.  (Id.).

On May 28, 2015, Barter filed a Charge of Discrimination with the EEOC.  (*EEOC Charge of Discrimination*, dated 05/28/2015).  Barter alleged that she had been sexually harassed by Ligon. (Id.).  She also alleged that she had been terminated by AT&T in retaliation for complaining about

the sexual harassment.  (Id.)  Messineo soon learned of the EEOC charge from AT&T's EEO Department.  (Messineo, at 27:12-20).

Shortly after the EEOC charge was filed, problems began to arise.  (Deschaine 33:20-34:3).  In June 2015, AT&T told NexLink that Barter could not act as an AT&T representative.  (Messineo, Exhibit P-4) ("We told the principal [NexLink] in June that [Barter] could not sell AT&T").  This instruction had come directly from Messineo through the Alliance Channel.  (Deschaine, 36:25 & 42:24-25).  Messineo gave no explanation to the Alliance Channel for the reason behind the prohibition.  (Id., at 37:2-6).

This was an unusual deviation from standard practice because Messineo was not part of the Alliance Chanel.  (Smith, at 17:24-25).  Smith testified that this was the only time that he has been told to inform a solutions provider that their representative could not market and sell AT&T services.  (Id., at 40:12-14).  He has worked for AT&T for 23 years.  (Id., at 9:20-22).  Deschaine also testified that he had never seen AT&T take this type of action with respect to an employee of a service provider.  (Deschaine, at 48:22-49:1).  He has worked for AT&T for 18 years.  (Id., at 6:16-17).  Messineo admitted that even she was not aware of any written AT&T policy that would limit Barter's employment at NexLink:

> Q.     Is there a written policy that provides that if a former employee of AT&T is terminated for AT&T code of business conduct, they cannot be a non-payroll work for a solutions provider?
>
> A.     I'm not aware of that.

(Messineo, at 28:10-15).

According to Smith, "acting as an AT&T representative" simply meant that Barter "could not sell and market AT&T services to clients."  (Smith, at 27:1-2).  Deschaine understood "acting as an AT&T representative" to mean only that Barter could not directly interface with AT&T customers.  (Deschaine, at 40:5-9 & 44:10-11).

After speaking with Smith and Deschaine in June 2015, Barter agreed to work in the background. (Barter, at 167:2-4). This did not create a problem at NexLink. (Deschaine, at 49:17-20). It did not cause a problem with the AT&T account. (Id., at 45:3-9 & 46:4-8).

In July 2015, Messineo told the Alliance Channel to confirm with NexLink that Barter was not acting as an AT&T representative. (Messineo, Exhibit P-4) ("Andrea Messineo sent me a meeting request to discuss further"). Smith and Deschaine confirmed that Barter was remaining in the background in July 2015. (Smith, at 34:7-8) ("It was my understanding she was in the background."). Barter was not representing AT&T. (Id., at 34:15-18). There was no indication that Barter was not complying with the June prohibition. (Deschaine, at 45:20-46:3 & 46:11-19).

A call was placed by AT&T to Messano on August 26, 2015. (Messano, 38:22-39:1). It was made around 12:00 noon. (Id.). It lasted 15 minutes. (Id., at 39:6-7). During the call, AT&T again told NexLink that Barter was not to act as an AT&T representative. (Deschaine, at 51:22-23). This was entirely unnecessary because Deschaine testified that there had been no problems with Barter or the NexLink account in July or August 2015. (Id., at 52:5-10). Messano and NexLink also confirmed that Barter had not been interfacing directly with AT&T customers for the past several months. (Id., at 54:19-22).

There is a dispute as to precisely what was discussed next. Messano contends that NexLink was told that Barter could not access any AT&T systems, could not enter any AT&T facilities, and could not speak with any AT&T customers or employees. (Messano, at 41:10-24). Deschaine denies this contention:

> Q.    The conversation with you and Greg [Smith] and Jeff [Messano].
>
> A.    Uh-huh.  Correct.
>
> Q.    In that conversation, was there any discussion that AT&T did not want Rachael Barter in AT&T's systems?
>
> A.    Not that I recall specifically.

Q.      Was there any discuss about whether or not AT&T wanted Rachael Barter in AT&T offices?

A.      No.

Q.      Was there any discuss that you recall about restricting her ability to speak with AT&T employees?

A.      No, not that I recall.

(Deschaine, 66:3-15).  Deschaine further testified:

Q.      What was discussed during [the August 26, 2015] conversation?

A.      The concerns that AT&T had raised about Rachael representing AT&T.

Q.      Are these different concerns from the concerns that we talked about back in July?

A.      No.

* * *

Q.      And it was your understanding that she had not been directly interfacing with customers after that prohibition had been made?

* * *

A.      Correct.

* * *

Q.      So, was the purpose of the August 26th call to expand on those restrictions?

* * *

A.      It sounded as more of a – to confirm, to confirm what we already had spoken about.

(Deschaine, at 51:21-52:2; 54:5-8; 54:9; 54:11-12 & 54:15-17).

AT&T provided absolutely no explanation to NexLink for the continued prohibitions. (Messano, at 42:3-7).  Messano found this odd.  (Id., at 42:8-9).  He was surprised and taken off guard by AT&T's call.  (Id., at 43:1-4).  There had been no performance problems with Barter at NexLink.  (Id., at 42:21-23).  There had been no problems on the AT&T account.  (Id., at 42:24-25).

AT&T did not explain the purported reason for Barter's termination – or even that Barter had been terminated – in March 2015.  (Messano, at 43:15-18).  It did not explain that Barter had been sexually harassed by Ligon while employed at AT&T.  (Id., at 43:25-44:2).   AT&T did not

explain that Barter had filed an EEOC charge in May 2015.  (Id., at 44:3-5).  It is undisputed that neither Smith or Deschaine, who made the call (at Messineo's direction), knew this information. It is also undisputed that Messano asked no questions pertaining to these issues.  (Id., at 43:18-19 & 64:8-9).

Messano then called Barter.  (Messano, at 49:9-13).  This was before 3:00 on the same afternoon.  (Id., at 49:24-50:2).  Barter explained to Messano that she had been sexually harassed by her boss at AT&T.  (Barter, at 96:25-97:8 & Messano, at 45:19-20).  Barter also told Messano that she had a pending EEOC charge.  (Barter, at 97:10-11).  She explained to Messano that AT&T was retaliating against her for filing the charge.  (Barter, at 97:10-12); (Messano, at 70:24-25) ("[Barter] had expressed she believed it was retaliation, correct.").  Messano recalled Barter explaining: "Somebody big went down and, therefore, this must be because of that."  (Messano, 45:22-23).

Barter told Messano that she was represented in the EEOC matter by an attorney. (Messano, at 51:23) ("She mentioned having an attorney.").  Barter invited Messano to call her counsel.  (Barter, at 97:10-12).

Messano decided to terminate Barter later that very same afternoon.  (Messano, at 54:10-11).  He admitted that he had not made this decision until after learning about Barter's sexual harassment claim against AT&T.  (Id., at 70:18-25).  He admitted that Barter was a good employee. (Id., at 55:5-6).  He also admitted that he would not have terminated Barter but for the call from AT&T earlier that day.  (Id., at 59:2-5).

Messano never asked for any explanation from AT&T as to why the restrictions were being placed on Barter.  (Messano, at 43:18-19 & 64:8-9).  He never questioned AT&T's directive even after learning that Barter had been sexually harassed at AT&T and now believed she was being

8

retaliated against for making an EEOC charge.  (Id., at 59:21-23).  He never contacted Barter's

attorney.  NexLink terminated Barter the next day.  (Id., at 66:14-17).

### STATEMENT OF MATERIAL FACTS IN DISPUTE

The following material facts are in dispute and preclude summary judgment:

1.       There is a genuine issue of material fact as to ***the true reason why Barter was***

***terminated by AT&T in March 2015***.  NexLink contends that Barter was terminated as part of an

internal investigation.  (NexLink Memo, at 8).  Barter contends that the reason she was terminated

was due to reporting the sexual harassment against Ligon.  (*EEOC Charge of Discrimination*).

2.       There is a genuine issue of material fact as to ***the scope of AT&T's prohibition as***

***of August 26, 2015***.  Messano contends that NexLink was told that Barter could not access any

AT&T systems, could not enter any AT&T facilities, and could not speak with any AT&T

customers or employees.  (Messano, at 41:10-24).  Deschaine testified that these restrictions were

never in place and that the purpose of the August 26 call was to simply confirm that the restriction

that was placed upon Barter by AT&T in June 2015 as being honored.  (Deschaine, at 51:21-52:2;

54:5-8; 54:9; 54:11-12; 54:15-17 & 66:3-15).

3.       There is a genuine issue of material fact as to ***whether Barter could perform her***

***job responsibilities after August 26, 2015***.  NexLink contends that it terminated Barter because

"she couldn't do her day-to-day job anymore with not being able to represent AT&T and also run

the NexLink/AT&T channel."  (NexLink Memo, at 9).  This contention is not only disputed; it is

simple pretext.  It is undisputed that Barter had been performing day-to-day responsibilities since

April 2015.  Moreover, it is undisputed that she had been performing them under the AT&T

restrictions since June 2015.  Deschaine testified that no further restrictions were placed upon

Barter in August 2015.  (Deschaine, at 51:21-52:2; 54:5-8; 54:9; 54:11-12; 54:15-17 & 66:3-15).

Thus, there is no reason to believe that Barter could not have continued performing her job responsibilities in the future. This is a question that must be answered by the jury.

4.      There is a genuine issue of material fact as to ***NexLink's true motive for terminating Barter***. NexLink contends that "[i]t is undisputed that AT&T's August 26 telephone call was the motivation for [its] actions." (NexLink Memo, at 16-17). But nothing could be further from the truth. The true motivation for NexLink's actions is highly contested. Indeed, it is the very dispute that is at the core of this lawsuit.

NexLink's timing is highly suspect. Barter informed Messano about the pending sexual harassment on the afternoon of August 26, 2015. She informed him that AT&T was simply retaliating against her at this same time. Messano admitted that he did not make the decision to terminate Barter until after learning this information. (Messano, at 70:18-25). Barter was fired the next day. Her termination is sufficiently close in time to NexLink learning of Barter's protected activity to raise a reasonable inference that she was terminated by NexLink in retaliation for reporting the sexual harassment at AT&T. It is sufficiently close in time to withstand summary judgment. See King v. Preferred Technical Group, 166 F.3d 887, 893 (7th Cir. 1999).

It is also undisputed that NexLink made absolutely no attempt to investigate Barter's claim that AT&T was simply retaliating against her before terminating her employment. This too gives rise to a reasonable inference that NexLink's purported reason for Barter's termination is simple pretext. See Hobbs v. City of Chicago, 573 F.3d 454, 464 (7th Cir. 2008) (Employer's failure to investigate may give rise to retaliation claim).

5.      There is a genuine issue of material fact as to ***whether Messano terminated Barter because he believed the AT&T contract was in jeopardy***. The close relationship between AT&T and NexLink cannot be overlooked. NexLink was an AT&T Solutions Provider. AT&T held a

great degree of control over NexLink's operations.  (NexLink Memo, at 8-9).  All these facts give rise to a reasonable inference that NexLink terminated Barter simply to protect the AT&T contract – and, in turn, NexLink's own financial interests.

There is also conflicting testimony on this issue.  This is clear in NexLink's brief.  In its statement of undisputed material facts, NexLink indicates: "Messano called [Barter] the next day and stated 'I'm forced to terminate you.'  NexLink couldn't jeopardize the AT&T relationship, and AT&T was not going to budge on [Barter] working at NexLink in any way, shape or form." (NexLink Memo, at 10) (citing Barter, at 186:12-187:3).  Yet, Messano testified that he was never given the impression that the AT&T contract was in jeopardy.  (Messano, at 49:3-6).  He was never concerned that it might be.  (Id., at 49:7-8).  This is an inconsistency that can only be reconciled by the jury.

## LEGAL ANALYSIS

### I.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FEDERAL RULE OF CIVIL PROCEDURE 56(c).  Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. Jackson v. Verizon Wireless, 767 F.Supp.2d 728, 734 (S.D. Ind. 2009).  In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party.  Id.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes.  Id., at 735.  Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate.  Id.

The summary judgment standard is applied rigorously in employment discrimination cases, because intent and credibility are such critical issues and direct evidence is rarely available.  Id. To that end, the district court carefully reviews the affidavits and depositions for circumstantial evidence which, if believed, would demonstrate discrimination.  Id.

II.   TITLE VII RETALIATION

Title VII prohibits employers from engaging in any retaliatory conduct against an employee who participates in a Title VII proceeding.  42 U.S.C. § 2000e-3(a).  Title VII's "participation clause" protects employees who file internal claims as well as those who file a formal charge with the EEOC.  Id.  Title VII also prohibits an employer from retaliating against an employee who made a charge against a former employer.  Fowler v. Columbia College Chicago, 397 F.3d 532, 533-34 (7th Cir. 2005).

A prima facie case of retaliation exists when the plaintiff, by direct or circumstantial evidence, establishes that: (1) she engaged in a statutorily protected activity, (2) she suffered a materially adverse employment action, and (3) a causal connection exists between the two.  Harper v. C.R. England, Inc., 687 F.3d 297, 306 (7th Cir. 2012).

In the Seventh Circuit, the legal standard is whether "the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action."  Ortiz v. Werner Enterprises, Inc., 834 F.3d 760, 765 (7th Cir. 2016).  All relevant evidence must be considered and all irrelevant evidence disregarded.  Id.  But no evidence should be treated differently from other evidence because it can be labelled "direct" or "indirect."  Id.

The filing of the May 2015 EEOC charge was a protected action as a matter of law. It is undisputed that Barter's termination from NexLink was an adverse employment action. This leaves only the causal connection element in dispute.

III.   SUMMARY JUDGMENT IS INAPPROPRIATE

Summary judgment is inappropriate in this case because there are genuine issues of material fact surrounding the causal connection element of Barter's retaliation claim.

In the Seventh Circuit, a plaintiff demonstrates a causal connection by showing that the defendant would not have taken the adverse action but for the protected activity. Barnes v. Walgreens Co., 863 F.3d 656, 661 (7th Cir. 2017). Direct evidence, such as an admission by the employer of unlawful animus is sufficient, but rare. Id. Thus, a plaintiff may also supply the causal link through circumstantial evidence from which a jury may infer intentional discrimination. Id. "If a plaintiff can assemble from the various scraps of circumstantial evidence enough to allow the trier of fact to conclude that it is more likely than not that discrimination lay behind the adverse action, then summary judgment for the defendant is not appropriate." Id., at 661-62.

A.   Barter's Job Performance

The thrust of NexLink's summary judgment motion is that Barter was terminated because she could no longer perform her job after the August 26, 2015 call. But this is highly disputed. The designated evidence establishes that this proffered reason is mere pretext. In the Seventh Circuit, pretext can be shown by identifying weakness, implausibility, inconsistencies, or contractions in an employer's asserted reason for taking an adverse employment action such that a reasonable person could find it unworthy of credence. Greengrass v. International Monetary Systems, Ltd., 776 F.3d 481, 487 (7th Cir. 2015). At a minimum, there is a genuine issue of material fact precluding summary judgment here.

AT&T instructed NexLink that Barter could not market and sell AT&T services in June 2015.  (Messineo, at Exhibit P-4).  Barter agreed to work in the background.  (Barter, at 167:2-4).  Deschaine testified that this restriction did not create a problem at NexLink or with the AT&T account.  (Deschaine, at 45:3-9; 46:4-8 & 49:17-20).  There were no problems with Barter in July 2015.  (Id., 52:5-10).  There were also no problems with Barter in August 2015.  (Id.).  Deschaine explained that the purpose of the August 26, 2015 call was not to expand on the June/July restriction, but "to confirm what we had already spoken about."  (Id., at 51:21-52:2; 54:5-8; 54:9; 54:11-12 & 54:15-17).

Messano also testified that there had been no performance problems with Barter at NexLink.  (Messano, 42:21-23).  There had been no problems on the AT&T account.  (Id., at 42:24-25).  Barter was a good-employee.  (Id., at 55:5-6).

All of this evidence is wholly inconsistent with NexLink's asserted reason for terminating Barter.  Clearly, Barter had been performing day-to-day responsibilities since April 2015.  Moreover, she had been performing them under the AT&T restrictions since June 2015.  Deschaine testified that no further restrictions were placed upon Barter in August 2015.  Thus, a reasonable person could find NexLink's purported reason for terminating Barter unworthy of credence.  Greengrass, 776 F.3d at 487.  Barter had been performing her job responsibilities for several months – even under the AT&T restrictions.  After August 26, 2015, nothing had changed.  Thus, there is no reason to believe that she could not have continued to perform these same job duties in the future.

B.      The Scope of the August 26th Prohibition

NexLink cites Daniel v. Sargent & Lundy, LLC in its brief for the proposition "that [no one] at NexLink knew that AT&T had a retaliatory motive for AT&T's instruction to NexLink (or that AT&T has such a motive)."  (NexLink Memo, at 18).  But this is simply false.

In fact, Messano admitted that Barter told him that she believed AT&T was acting in retaliation before he terminated her.  (Messano, at 70:24-25) ("[Barter] had expressed she believed it was retaliation, correct.").  Messano even recalled Barter explaining: "Somebody big went down and, therefore, this must be because of that."  (Messano, 45:22-23).

In Daniel, the Northern District of Illinois held that an employer (ABM) did not act improperly where it removed an employee (Daniel) from her position after a customer (S&L) complained to the employer (ABM) that it no longer wanted the employee (Daniel) working at its (S&L's) offices.  2012 U.S. Dist. LEXIS 34013 (N.D. Ill. March 14, 2012).  The district court reasoned:

> ABM did not make a decision on the basis of race, and it did not adopt its customer's race based-preferences.  Rather, ABM decided to remove Daniel from the S&L position after S&L said that Daniel was barred from its offices for violating S&L's rules [namely, sleeping on the job].  ***Daniel has not provided any evidence from which a reasonable jury could conclude ABM had any awareness that S&L had a racial motivation*** for barring her from working at its offices.

Id., at * 28. (emphasis added).[1]

Daniel does not support NexLink.  Rather, it supports Barter.  In Daniel, ABM was not liable because it had no awareness of S&L's racial motivation.  Yet, it this case, it is undisputed that ***NexLink was <u>fully aware</u> that Barter had made a sexual harassment charge and believed that AT&T was simply retaliating against her <u>before</u> NexLink decided to terminate Barter***.  (Messano, at 70:18-25).  Whether or not his knowledge was confirmed by AT&T is of no moment.

---

[1]      This same language is also quoted in NexLink's summary judgment brief.  (NexLink Memo, at 18).

NexLink's implication – that it cannot be held liable for retaliation because it was simply complying with AT&T's directives – also misses the mark.  There is no evidence that AT&T expressly instructed NexLink to terminate Barter.[2]  Messano testified that he was never given the impression that the AT&T contract was in jeopardy.  (Messano, at 49:3-6).  He was never concerned that it might be.  (Id., at 49:7-8).

### C.   NexLink's True Motive

There is also a genuine question of material fact as to NexLink's true motive in terminating Barter's employment.  "[C]ircumstantial evidence of retaliation may include suspicious timing, ambiguous statements, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn."  Harper, 687 F.3d at 306.  The close proximity in time and NexLink's failure to investigate the veracity of Barter's allegations of retaliation by AT&T are both additional factors that would lead a reasonable juror to conclude that NexLink's proffered reason for Barter's termination – namely, that she could not perform her job – is pretextual.  So is the close relationship between AT&T and NexLink.

### 1.   Suspicious Timing

The Seventh Circuit has held that suspicious timing is generally found when "an adverse employment action follows close on the heels of protected expression."  Greengrass, 776 F.3d at 486.  Whether the amount of time lapsed is suspicious depends upon the context of the case.  Id.

In Greengrass, the Seventh Circuit held that a four-month lapse between an employer becoming aware of an employee's intention to seriously pursue her EEOC claim and the adverse action was sufficient to preclude summary judgment.  776 F.3d, at 487.  Likewise, in Welch v.

---

[2]   There is conflicting evidence as to whether NexLink felt "forced" to do the same.  Section III.C.3, supra.

Eli Lilly & Company, this Court held that a four-month lapse between the plaintiff's complaint of discrimination and the adverse action was sufficient to survive summary judgment.  2013 WL 4413323, at *20 (S.D. Ind. Aug. 15, 2013).

NexLink's timing is highly suspect.  AT&T called about Barter at 12:00 noon.  Barter informed Messano about the pending sexual harassment charge only hours later.[3]  Yet, by the end of the day, and without a shred of investigation into Barter's claim, Messano had decided to terminate her.  Barter was fired the next day.  This is sufficiently close in time to withstand summary judgment.  See King, 166 F.3d at 893 ("[Employer] terminated [employee] only one day after she completed her leave of absence under the FLMA.  Such a close proximity is sufficient to [defeat summary judgment].").

2.  Failure to Investigate

The Seventh Circuit has also held that a failure to investigate may constitute the basis for a retaliation claim.  Hobbs, 573 F.3d at 464.  It is undisputed that NexLink did not make the decision to terminate Barter until **after** it learned about the EEOC charge.  It is also undisputed that NexLink made absolutely **no attempt** to investigate Barter's claim that AT&T was simply retaliating against her before terminating her employment.  Messano did not ask AT&T why a continued prohibition against Barter was necessary.  He did not demand further information from AT&T regarding Barter sexual harassment and retaliation claims.  He did not contact the EEOC.  He did not contact Barter's attorney.

---

[3]       NexLink admits that Barter referenced the EEOC investigation and that it related to sexual harassment by a former supervisor at AT&T.  (NexLink Memo, at 11).  This is more than sufficient to establish that NexLink had actual knowledge of the protected activity.  Title VII protects against retaliation for making both internal complaints and formal EEOC charges. 42 U.S.C. § 2000e-3(a).  NexLink's contention that Barter "did not reveal [the] details" of the sexual harassment is a red-herring and provides no justification or defense for NexLink's actions.  (Id.).

Once Barter's accusations of sexual harassment and retaliation came to light, NexLink was not entitled to simply sit back and ignore them.  Motley v. Tractor Supply Co., 32 F.Supp.2d 1026, 1052 (S.D. Ind. 1998).  "At the least, [NexLink] should have conducted an investigation into the harassment [and retaliation] charges against [AT&T], as it would have been expected to do if [those charges had been made against NexLink directly].  To do otherwise constitutes an act of retaliation against an employee for filing a charge."  Id.

### 3.    The AT&T/NexLink Contract

The close relationship between AT&T and NexLink cannot be overlooked.  It too provides circumstantial evidence of retaliation.  It too precludes summary judgment.

NexLink was an AT&T Solutions Provider.  It facilitated equipment and service contracts between AT&T and AT&T's own customers.  As an employee of an AT&T solutions provider, Barter was classified by AT&T as a Non-Payroll Worker.  She was even subject to AT&T's Non-Payroll Worker Policy.

AT&T held a great deal of control over NexLink's operations.   In fact, the solutions provider contract stated that AT&T "retain[s] the right to prohibit [NexLink] from using any Person or Subcontractor in connection with the Services provided under the Agreement for any reason." (NexLink Memo, at 8-9).[4]

NexLink brief states: "Messano called [Barter] the next day and stated 'I'm forced to terminate you.'  NexLink couldn't jeopardize the AT&T relationship, and AT&T was not going to budge on [Barter] working at NexLink in any way, shape or form." (Id., at 10).  This statement is problematic for at least two reasons.

---

[4]        In this litigation, NexLink has attempted to hide behind this contractual language to shield it from civil liability.  But AT&T's right to foreclose Barter's employment at NexLink "for any reason" does not include limiting or prohibiting her employment for illegitimate and illegal reasons.   AT&T cannot use the Solutions Provider Agreement as a vehicle to retaliate against Barter for filing an EEOC claim.

First, it is wholly inconsistent with NexLink's contention that it terminated Barter because she could no longer perform her day-to-day job.  <u>Greengrass</u>, 776 F.3d at 487 (Pretext can be shown by inconsistencies or contractions in an employer's asserted reason for taking an adverse employment action).  It, thus, begs the question:  Why was Barter really terminated?  Because of her job performance?  Because the AT&T contract was in jeopardy?  Or, because NexLink was being "forced" by AT&T to terminate Barter in retaliation for making an EEOC charge?  This is a highly contested factual dispute.

Second, Messano's own testimony is in direct contradiction of this purportedly "undisputed" material fact.  (NexLink Memo, at 10).  Messano testified that he was never given the impression that the AT&T contract was in jeopardy.  (Messano, at 49:3-6).  He was never concerned that it might be.  (<u>Id.</u>, at 49:7-8).  Interestingly enough, NexLink takes this position earlier in its memorandum.  (NexLink Memo, at 7) ("[T]here was no concern that Ms. Barter's continued employment might jeopardize NexLink's contract with AT&T.").  Of course, if NexLink ultimately settles upon this latter position – namely, that the AT&T contract was never in jeopardy – then, this would foreclose its "business necessity" affirmative defense.[5]  In the meantime, the genuine issue of material fact surrounding NexLink's true motive for terminating Barter precludes summary judgment.

## <u>CONCLUSION</u>

For each of these reasons, NexLink's motion for summary judgment should be denied.

---

[5]    Barter does not concede that the 'business necessity' defense is appropriate in a retaliation case.  <u>See</u> <u>Griggs v. Duke Power Company</u>, 401 U.S. 424, 431 (1971) (Business necessity constitutes a defense to a disparate-impact claim).

Respectfully Submitted,

**LEWIS & KAPPES, P.C.**

*/s/ David W. Gray*
David W. Gray (7260-49)
Matthew S. Tarkington (23773-49)
One American Square, Suite 2500
Indianapolis, Indiana, 46282-0003
(317) 639-1210
(317) 639-4882 (fax)
dgray@lewis-kappes.com
mtarkington@lewis-kappes.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 14, 2018, the foregoing document was filed electronically. Service of this filing will be made on all counsel of record by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

*/s/ David W. Gray*_____
David W. Gray (7260-49)


LEWIS & KAPPES, P.C.
One American Square, Suite 2500
Indianapolis, Indiana 46282
(317) 639-1210
(317) 639-4882 (fax)
dgray@lewis-kappes.com