UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

RACHAEL D BARTER, )
)
        Plaintiff, )
)
        v. ) No. 1:17-cv-00622-SEB-DML
)
AT&T, INC., )
NEXLINK COMMUNICATIONS, LLC, )
)
        Defendants. )

**ORDER DENYING DEFENDANT NEXLINK COMMUNICATIONS LLC'S MOTION FOR SUMMARY JUDGMENT**

This cause is before the Court on the Motion for Summary Judgment [Docket No. 46], filed by Defendant Nexlink Communications, Inc. ("Nexlink") on April 27, 2018. Plaintiff Rachael D. Barter brought this lawsuit against Nexlink and Defendant AT&T, Inc. ("AT&T"),[1] her former employers, alleging that each terminated her in retaliation for having complained of sexual harassment, in violation of Title VII of the Civil Rights Act of 1964. Nexlink has moved for summary judgment on Ms. Barter's retaliation claim. For the reasons detailed below, we DENY Defendant Nexlink's Motion for Summary Judgment.[2]

---

[1] On April 18, 2017, pursuant to the parties' Joint Stipulation to Arbitrate Claims and Stay Litigation Against Defendant AT&T [Dkt. 15], we ordered that Ms. Barter's claims against AT&T be submitted to arbitration and stayed litigation of those claims pending completion of the arbitration. Dkt. 17.

[2] On January 15, 2019, Nexlink filed a Motion for Leave to File Supplemental Designation of Evidence in Support of Its Motion for Summary Judgment and to Maintain Documents Under Seal [Dkt. 78]. Having considered Nexlink's motion and being duly advised in the premises, we hereby GRANT the motion. The documents labeled "AT&T Privileged Documents 001234 through 001261" and designated as Exhibit E to Defendant's Supplemental Designation of

**Factual Background**

*Plaintiff's Employment at AT&T*

Ms. Barter was hired by AT&T in 2008 as a business account manager and was promoted to the position of sales manager in 2009. As sales manager, Ms. Barter oversaw multiple business account managers. Ms. Barter originally worked in Michigan but was transferred to Indianapolis in 2011 where she served as a sales manager for the mobile division. Near the end of 2013, Ms. Barter was laterally transferred to the Indianapolis landline division where she continued to be employed as a sales manager. After her transfer, Ms. Barter was supervised by John Ligon. Vice President of Sales Andrea Messineo served as Mr. Ligon's immediate supervisor.

In May 2014, Ms. Barter learned that AT&T's Small Business Group was fraudulently inflating its IRU (widget) counts in order to meet its sales goals. Ms. Barter reported this information to Mr. Ligon, who she says told her to begin inflating the landline team's widget count using the same method. According to Ms. Barter, at Mr. Ligon's direction and because she feared termination if she did not follow his instructions, she inflated the landline team's IRU counts for several months in order to meet sales goals by accessing new individual accounts on AT&T's Phoenix system and linking unauthorized business discounts to the individual accounts she accessed so that her department could claim the revenue. She did not earn extra compensation or any commission from inflating the numbers.

---

Evidence and filed under seal shall be maintained as documents under seal in accordance with L.R. 5-11(d)(2)(ii) and the Uniform Stipulated Protective Order of October 20, 2017.

Ms. Barter attended a business trip with Mr. Ligon in September 2014. Ms. Barter testified that Mr. Ligon drank heavily during dinner and then asked her to come to his hotel room to discuss business. Ms. Barter sat on a chair in his hotel room while Mr. Ligon sat on the bed. He patted the bed and told her to sit by him. Ms. Barter contends that when she refused to do so, he exposed himself to her and told her not to act like she did not want it. Ms. Barter then left the room. Upon her return to work, Ms. Barter reported the incident "hypothetically" to Michelle Caniglia in AT&T Human Resources, who, according to Ms. Barter, advised her not to make a formal harassment report because, without evidence, it was likely that nothing would be done beyond moving her to another supervisor and she might then be considered a difficult employee for having made a report.

In January 2015, AT&T discovered that the landline department's IRU numbers had been inflated for a number of months and advised Ms. Barter that she was being investigated for violating the company's code of conduct in connection with the inflation. As part of the investigation, Ms. Barter was interviewed by Jim Lekse in AT&T's asset protection department. During her interview, she admitted that she had violated AT&T's Code of Conduct by padding the IRU numbers to increase her team's total sales on a monthly basis. Ms. Barter reported that Ms. Ligon had told her to do it and also reported that he had sexually harassed her. Following this interview, she was suspended pending further investigation.

In March 2015, Ms. Barter returned to AT&T for a second meeting with Mr. Leske after which Ms. Messineo terminated her on March 16, 2015 for violating AT&T's

3

code of business conduct by improperly accessing individual accounts and linking business discounts to those accounts in order to inflate the IRU numbers. Ms. Barter signed a statement on the day she was terminated admitting that she engaged in such conduct.

Mr. Ligon resigned from AT&T shortly after Ms. Barter made her sexual harassment report in January 2015. AT&T was in the process of investigating Ms. Barter's allegations when Mr. Ligon resigned. AT&T had not formally disciplined him either for sexual harassment or the inflation of the IRU numbers by the time he resigned.

*Plaintiff's Employment at Nexlink Communications*

Defendant Nexlink is a distributor of new and used wireless devices and associated services and serves as a "Solutions Provider" ("SP") for AT&T. An SP is an independent third party that typically represents multiple companies (so one SP might represent AT&T, Verizon, and T-Mobile, for example) and recommends that customers buy services from the companies it represents based on the customers' needs. Thus, as an AT&T SP, Nexlink acts as a sales agent for AT&T and sells AT&T network services to its business customers. On April 1, 2015, Ms. Barter was hired by Nexlink as its Director of AT&T Channel Sales. Ms. Barter did not disclose before Nexlink hired her that she had been investigated, suspended, and ultimately terminated by AT&T.

The relationship between AT&T and Nexlink is governed by an AT&T Affiliate Agreement ("the Agreement"). Under the Agreement, Ms. Barter was classified by AT&T as a "Non-Payroll Worker." The Agreement also provided that "AT&T shall … retain the right to prohibit [Nexlink] from using any Person, or Subcontractor in

connection with the Services provided under this Agreement for any reason." Barter Dep. Exh. 5.

Ms. Barter's focus as Director of AT&T Channel sales was to develop the AT&T channel for Nexlink. The AT&T sales "channel" included any product or service that could be tied back to AT&T, including Nexlink refurbished equipment activated on the AT&T network. At all times relevant to this litigation, Ms. Barter reported to Nexlink's Jeff Messano and Steve Cosgrove. Her primary contacts at AT&T were Greg Smith and Marty Deschaine, who were both employed in AT&T's Alliance Channel, a group within AT&T that manages its SPs. In her position with Nexlink, Ms. Barter had no contact with Ms. Messineo, the supervisor who had made the decision to terminate her from AT&T, as Messineo worked in AT&T's Small Business Channel which at that time did not partner with SPs.

When Ms. Barter began working for Nexlink in April 2015, AT&T provided her access to its SPOT, ROME Mobility, and Fieldglass computer/database systems, but denied her access to the Phoenix system. Mr. Smith developed a solution whereby Ms. Barter could access the Phoenix system indirectly, which still allowed her to perform the duties of her job. According to Mr. Smith, it was "not uncommon for sales folks not to have Phoenix access, as long as somebody in the back office ha[d] Phoenix access." Smith Dep. at 24. Mr. Messano, Ms. Barter's Nexlink supervisor, testified that the Phoenix arrangement "was fine" with Nexlink. Messano Dep. at 30.

*Plaintiff Files a Charge of Discrimination*

On May 28, 2015, Ms. Barter filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging that she had been sexually harassed by Mr. Ligon and that AT&T had terminated her in retaliation for her having complained about the sexual harassment. Shortly after it was filed, Ms. Messineo learned of the EEOC charge from AT&T's EEO Department.

*AT&T Restricts Plaintiff's Duties*

The record is not clear as to the exact date, but sometime in April or May 2015, Mr. Deschaine for the first time informed Mr. Messano at Nexlink that AT&T did not want Ms. Barter "representing" the company. Mr. Deschaine understood this to mean that Ms. Barter was restricted from interfacing with AT&T customers. Deschaine Dep. at 42–43. Mr. Smith believed the restriction meant that Ms. Barter "could not sell and market AT&T services to clients." Smith Dep. at 27. Deschaine Dep. at 42–43. It is unclear what Mr. Messano understood the parameters of this restriction to be.

AT&T's restriction originated with Ms. Messineo, who had learned in April 2015 that Ms. Barter was working for Nexlink. After consulting with AT&T's attorneys and human resources department, Ms. Messineo imposed this restriction because she believed that Ms. Barter had demonstrated an integrity issue while employed by AT&T, and, in Ms. Barter's position with Nexlink, she would have access to the same systems that she had previously used to improperly access AT&T's customer records. Messineo Dep. at 19. Ms. Messineo did not explain to the Alliance Channel her reasons for imposing this restriction and neither Mr. Smith nor Mr. Deschaine knew the details of Ms. Barter's former employment with AT&T. Both Mr. Smith and Mr. Deschaine testified that this

6

was the first time either of them had been told to inform a solutions provider that its representative could not market and sell AT&T services.

Once AT&T's restriction was communicated to Ms. Barter by Mr. Smith and Mr. Deschaine, she agreed to work in the background. However, at some point in July 2015, a concern was raised within AT&T that Ms. Barter was continuing to represent AT&T in a sales capacity in her position with Nexlink. Ms. Messineo contacted the Alliance Channel a second time in late July 2015 to confirm that Ms. Barter was abiding by the restriction and not representing AT&T in the marketplace. On July 28, 2015, Mr. Smith emailed Ms. Barter to ensure that she was "not customer facing when it comes to AT&T services." Smith Dep. Exh. H. Ms. Barter confirmed that she was "in the background." *Id.*

Ms. Messineo again raised concerns regarding Ms. Barter's sales activity in late August 2015 and requested that Mr. Quinn's team contact Nexlink to ensure that Ms. Barter was not engaging in any AT&T sales activity. On August 26, 2015, Mr. Smith and Mr. Deschaine contacted Nexlink's Mr. Messano by telephone and reiterated that Ms. Barter "could not market and sell AT&T." Smith Dep. at 38–39. Mr. Messano testified that he was told for the first time during that conversation that Ms. Barter could not access any AT&T systems, enter any AT&T facilities, or speak with any AT&T customers or employees. Messano Dep. at 41. Mr. Deschaine, however, denies that any additional restrictions were imposed on Ms. Barter's employment during this conversation; rather, Mr. Deschaine believed the call was "to confirm" what had previously been discussed regarding Ms. Barter's restrictions. Deschaine Dep. at 51–52,

7

54, 66. AT&T did not provide an explanation to Nexlink for the continued restrictions. Neither AT&T representative instructed or implied that Nexlink should terminate Ms. Barter's employment nor did they indicate that Nexlink's contract with AT&T was in jeopardy. Smith Dep. at 41–42.

*Plaintiff's Termination*

A few hours after speaking with AT&T, Mr. Messano telephoned Ms. Barter about the conversation and asked whether she knew why AT&T was restricting her duties. Mr. Messano was unaware at that time of the details surrounding Ms. Barter's employment history with AT&T, including that she had been sexually harassed and had filed an EEOC charge. During that telephone call, Ms. Barter for the first time told Mr. Messano that she had been sexually harassed by her boss at AT&T and that she had a pending EEOC charge against the company but did not describe in detail her allegations. She stated that she believed AT&T was retaliating against her for filing the charge. According to Mr. Messano, Ms. Barter explained that "[s]omebody big [at AT&T] went down and, therefore, this must be because of that." Messano Dep. at 45. Ms. Barter said that she was represented by counsel in the EEOC matter and told Mr. Messano to call her attorney if he had questions. Messano Dep. at 51; Barter Dep. at 97.

Mr. Messano decided later that same afternoon to terminate Ms. Barter after consulting with his partner, Mr. Cosgrove, as well as Nexlink's attorney. Mr. Messano officially terminated Ms. Barter's employment the next day, on August 27, 2015. The reason given for the termination decision was that Ms. Barter's job was to run Nexlink's AT&T sales division and she could no longer perform those duties given the restrictions

8

imposed by AT&T. Before reaching the termination decision, no one at Nexlink investigated Ms. Barter's allegation that AT&T was retaliating against her for having filed a sexual harassment complaint.

*The Instant Litigation*

On February 28, 2017, after receiving a Notice of Right to Sue from the EEOC, Ms. Barter filed her Complaint in this action against AT&T and Nexlink, alleging that, in violation of Title VII, each company terminated her in retaliation for her having filed a sexual harassment complaint while employed by AT&T. Nexlink moved for summary judgment on Ms. Barter's retaliation claim on April 27, 2018.

## Legal Analysis

### I. Summary Judgment Standard

Summary judgment is appropriate where there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A court must grant a motion for summary judgment if it appears that no reasonable trier of fact could find in favor of the nonmovant on the basis of the designated admissible evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). We neither weigh the evidence nor evaluate the credibility of witnesses, *id.* at 255, but view the facts and the reasonable inferences flowing from them in the light most favorable to the nonmovant. *McConnell v. McKillip*, 573 F. Supp. 2d 1090, 1097 (S.D. Ind. 2008).

### II. Discussion

9

Ms. Barter alleges that, in violation of Title VII, Nexlink terminated her in retaliation for her having filed a charge of discrimination based on sexual harassment while employed with AT&T. An analysis of this claim invokes the Seventh Circuit's decision in *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016), which states that regardless of whether the court uses the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) or some other framework to evaluate a plaintiff's employment discrimination and retaliation claims, "the ultimate legal question 'is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action.'" *Reed v. Freedom Mortg. Corp.*, 869 F.3d 543, 547 (7th Cir. 2017) (quoting *Ortiz*, 834 F.3d at 765). Under this "simplified" approach, the "[e]vidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence." *Ortiz*, 834 F.3d at 765.

Title VII "prohibits retaliation against employees who engage in statutorily protected activity by opposing unlawful employment practice or participating in the investigation of one." *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016) (citing 42 U.S.C. § 2000e–3(a)). To survive summary judgment on a Title VII retaliation claim, a plaintiff "must demonstrate that she engaged in protected activity, that she suffered an adverse action, and that there is a causal connection between the two." *Rowlands v. United Parcel Service – Fort Wayne*, 901 F.3d 792, 801 (7th Cir. 2018) (internal citation and quotation marks omitted). Here, it is undisputed that Ms. Barter
10

engaged in statutorily protected activity while employed by AT&T and that she was terminated one day after Nexlink learned that she had complained of sexual harassment in her former position. Accordingly, the only element in dispute is causation.

Upon careful review of the record, we find that genuine issues of material fact exist which preclude summary judgment in Nexlink's favor on Ms. Barter's retaliatory discharge claim. Ms. Barter can use either direct or circumstantial evidence to establish that retaliation was the "but for" reason for her termination. *Monroe v. Indiana Dep't of Transp.*, 871 F.3d 495, 504 (7th Cir. 2017). As with most cases, there is no direct evidence of a retaliatory motive here. However, the Seventh Circuit has recognized the following four types of circumstantial evidence on which a plaintiff may rely to provide a basis for drawing an inference of intentional discrimination: "(1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive[d] better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action." *Id.* (citing *Bunn v. Khoury Enter., Inc.*, 753 F.3d 676, 681 (7th Cir. 2014)).

Ms. Barter relies on the first and fourth categories of circumstantial evidence to support her retaliation claim, arguing that she was terminated only one day after first informing Nexlink that she had complained of sexual harassment while employed at AT&T and that she believed AT&T was retaliating against her by imposing restrictions on her employment with Nexlink and that Nexlink's proffered reason for her termination was pretextual. Nexlink rejoins that it terminated Ms. Barter not for any retaliatory

reason, but because she would have been unable to perform her job duties going forward, given the permanent restrictions conveyed to Mr. Messano by AT&T during his August 26, 2015 telephone conversation with Mr. Smith and Mr. Deschaine. Nexlink maintains that these restrictions were more onerous than those previously imposed by AT&T and would have entirely prevented Ms. Barter from performing the job she was hired to do, to wit, the marketing and sale of AT&T products and services to Nexlink's customers.

However, genuine disputes of material fact exist as to the exact message that was communicated to Mr. Messano by Mr. Smith and Mr. Deschaine during the August 26 conversation and as to when Mr. Messano and Nexlink first understood the full extent of the restrictions imposed on Ms. Barter by AT&T. Plaintiff has adduced evidence from which a reasonable jury could conclude that no new restrictions were imposed during the August 26 telephone conversation and that Ms. Barter had been satisfactorily performing her job duties under those restrictions since she was hired by Nexlink with no complaints from Nexlink regarding her performance.

If the jury believes such evidence, it could reasonably conclude that Nexlink's proffered reason for Ms. Barter's termination was pretextual[3] and that the only thing that changed on August 26 was that Ms. Barter shared with Mr. Messano that she had complained about sexual harassment while employed by AT&T and that she believed

---

[3] There is also conflicting evidence in the record regarding whether Nexlink believed that its contract would be in jeopardy if it continued to employ Ms. Barter. Ms. Barter testified that Mr. Messano told her that he was "forced to terminate" her because Nexlink could not afford to jeopardize its relationship with AT&T. According to Mr. Messano, however, he was never given the impression that the AT&T contract was in jeopardy nor was he ever concerned that it might be.

12

AT&T was retaliating against her by imposing restrictions on her employment with Nexlink. She was terminated the next day. On these facts, a jury could find that Nexlink terminated her in retaliation for having engaged in protected activity while working with AT&T. *See Coleman v. Donahoe*, 667 F.3d 835, 860–62 (7th Cir. 2012) (holding evidence of causation sufficient to withstand summary judgment where employee suffered adverse employment action within one month of her employer's knowledge of her race and sex discrimination complaints and she had also presented evidence of pretext).

Mr. Messano claims that he was not aware until the August 26 conversation that the restrictions imposed on Ms. Barter were permanent and prevented her from accessing any AT&T systems, entering any AT&T facilities, or interacting with any AT&T customers or employees. But there is also testimony in the record from Mr. Deschaine who stated that no new restrictions were imposed during the August 26 telephone conversation and the call was merely to reiterate the restrictions that had already been communicated to Nexlink and under which Ms. Barter had operated since she was hired by Nexlink. Thus, genuine issues of material fact exist regarding the extent of Mr. Messano's knowledge and understanding of the scope of the restrictions placed on Ms. Barter by AT&T before the August 26 telephone conversation and the extent to which, if at all, those restrictions were made more stringent during that call, either in reality or as perceived by Mr. Messano. Ultimately, a jury could believe Mr. Messano's explanation and find that Nexlink terminated Ms. Barter for a legitimate business reason but resolving

this dispute will require credibility determinations that cannot be made on summary judgment.

## III. Conclusion

For the reasons detailed above, we <u>DENY</u> Defendant Nexlink's Motion for Summary Judgment.

IT IS SO ORDERED.

Date: _____2/7/2019_____          _____
                                 SARAH EVANS BARKER, JUDGE
                                 United States District Court
                                 Southern District of Indiana


Distribution:

Bianca Black
KIGHTLINGER & GRAY, LLP (Indianapolis)
bianca1.black@yahoo.com

Sara R. Blevins
LEWIS & KAPPES PC
sblevins@lewis-kappes.com

Kristen M. Carroll
KIGHTLINGER & GRAY, LLP (Indianapolis)
kcarroll@k-glaw.com

David W. Gray
LEWIS & KAPPES PC
dgray@lewis-kappes.com

Robert M. Kelso
KIGHTLINGER & GRAY LLP
rkelso@k-glaw.com

14

Laura A. Lindner
LITTLER MENDELSON, P.C. (Milwaukee)
llindner@littler.com

Brian Lee Mosby
LITTLER MENDELSON, P.C.
bmosby@littler.com

Matthew S. Tarkington
LEWIS & KAPPES PC
mtarkington@lewis-kappes.com

Jennifer Van Dame
KIGHTLINGER & GRAY, LLP (Indianapolis)
jvandame@k-glaw.com